UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| DAKOTA FISCHER, | CIVIL ACTION NO. 2:19-cv-01342 |
| Plaintiff, | |
| vs. | |
| REMINGTON ARMS COMPANY, LLC, REMINGTON OUTDOOR CO., INC., THE MARLIN FIREARMS CO., HORNADY MANUFACTURING CO., and ABC COMPANIES #1 through #5, | Judge Edmund A. Sargus, Jr. |
| Defendants. | |

---

**Hornady Manufacturing Co.'s Brief in Support of Motion for Sanctions Against Non-Party Witnesses George Shope and Joshua Gee**

---

Respectfully submitted:

Kevin J. Schneider, # 18898
CLINE WILLIAMS WRIGHT
  JOHNSON & OLDFATHER, L.L.P.
1900 U.S. Bank Building
233 South 13th Street
Lincoln, Nebraska 68608-2095
(402) 474-6900
kschneider@clinewilliams.com
*Admitted Pro Hac Vice*

James E. Arnold (0037712)
Damion M. Clifford (077777)
Arnold & Clifford LLP
115 W. Main Street, 4th Floor
Columbus, NE 43215
dclifford@arnlaw.com

*Counsel for Defendant Hornady*

Dated this 7th day of May, 2020

## TABLE OF CONTENTS

I.   SUMMARY ................................................................................. ii

II.  INDEX OF SUPPORTING EVIDENCE ......................................................... iv

III. BACKGROUND .............................................................................. 1

IV.  ARGUMENT ............................................................................... 17

   A. Shope and Gee are Subject to the Court's Inherent Authority to Sanction

   Misconduct. ............................................................................. 19

   B. Shope and Gee are Also Subject to the Court's Authority to Impose

   Contempt Sanctions for Failure to Follow Court Order................................. 26

   C. Hornady is Entitled to Recover its Attorney's Fees................................. 27

V.  CONCLUSION .............................................................................. 28

# I.    SUMMARY

Pursuant to Local Rule 7.2(a)(3), Hornady provides the below summary of this brief.  Hornady's factual background section, section III, begins on page 1 and catalogues the litany of bad acts involved in this case.  Hornady's argument section, section IV, begins on page 17.

Subsection IV.A discusses the Court's authority to sanction non-party witnesses and begins on page 19.  It argues that the court has authority to sanction non-parties that abuse the litigation process.  The primary authorities relied upon are Chambers v. NASCO, Inc., 501 U.S. 32 (1991); Am. Tr. v. Sabino, 230 F.3d 1357, at *1 (6th Cir. 2000); Ndoye v. Major Performance LLC, No. 1:15-cv-380, 2017 WL 822110, at *11 (S.D. Ohio Mar. 1, 2017); and Bartos v. Pennsylvania, No. 1:08-cv-366, 2010 WL 1816674 (M.D. Penn. 2010).

Subsection IV.B discusses the Court's authority to impose contempt sanctions on witness who violate a deposition subpoena, and it begins on page 26.  It argues that George Shope and Joshua Gee violated a court order by appearing pursuant to a deposition subpoena and knowingly given false testimony.  The primary authorities relied on are Federal Rule of Civil Procedure 45(g); Marshal v. Bramer, 828 F.2d 355 (6th Cir. 1987); and U.S. S.E.C. v. Hyatt, 621 F.3d 687 (7th Cir. 2010).

Subsection IV.C argues that all of Hornady's fees, costs, and expenses incurred by it in this case were the direct result of Dakota Fischer's, George Shope's, and Joshua Gee's mendacity.  Because Fischer has settled Hornady's sanctions claim against him, and Shope and Gee have not likewise settled, the

sanctions claims against Shope and Gee remain to be resolved. Hornady is therefore entitled to sanctions against Shope and Gee in the amount of its fees, costs, and expenses incurred in defending this suit, less any amounts actually received by Hornady from Fischer.  It begins on page 27.

## II.    INDEX OF SUPPORTING EVIDENCE

The following evidence is attached hereto:

1.    Declaration of Kevin J. Schneider

      Exhibit A:    Plaintiff's demand letter

      Exhibit B:    Plaintiff's verified Answers to Interrogatories

      Exhibit C:    Report of Plaintiff's expert witness

      Exhibit D:    Deposition transcript of Plaintiff Dakota Fischer

      Exhibit E:    Deposition transcript of Joshua Gee

      Exhibit F:    Deposition transcript of George Shope

      Exhibit G:    Letter to Joshua Gee and George Shope providing notice of  intent to seek sanctions

      Exhibit H:    Handwritten receipt of evidence by Plaintiff's expert witness

      Exhibit I:    Subpoena and proof of service to George Shope

      Exhibit J:    Subpoena and proof of service to Joshua Gee

      Exhibit K:    Photographs of deposition exhibit 7

      Exhibit L:    Photographs of deposition exhibit 25

2.    Declaration of Steve Hornady

Hornady respectfully submits this brief in support of its Motion for Sanctions Against Non-Party Witnesses George Shope and Joshua Gee.

## III.   BACKGROUND

This case centers on a gun-explosion incident that occurred on March 26, 2017. (Declaration of Kevin Schneider ("Schneider Decl.") Ex. B, Answer to Interrogatory ("ATI") No. 3.)  That day, Plaintiff Dakota Fischer, friend Joshua Gee, and others were at the home of George Shope, Fischer's grandfather. (Id. Ex. B, ATI Nos. 2, 3.)  They were shooting a number of firearms, among them a Marlin .45-70 Government rifle that Shope had purchased the previous fall. (Id. Ex. B, ATI No. 6; id. Ex. F at 22:1–6.)

In or about September 2016, Shope had purchased at a trade show a crate of miscellaneous gun-related accoutrements, and in the crate was a box of .45-70 Government ammunition. (Id. Ex. F at 23:22–24:8, 25:22–26:12, 26:23–27:8.)  Although a reloading label on the box had the word "Hornady" printed on it, the sticker had hand writing on it clearly evidencing that the ammunition was handloaded and not factory loaded.[1] (Id. Ex. F at 32:10–33:3, 69:23–11; id. Ex. L.)  The sticker on the box showed the date of handloading was 1993, some twenty-four years prior. (Id. Ex. F at 70:12–15; id. Ex. L.)  Shope is experienced at handloading ammunition himself, and understood the ammunition in the box

---

[1] "Handloaded" or "reloaded" ammunition is ammunition that has been assembled or "loaded" (i.e. the bullet, propellant, and primer placed into the cartridge) manually by an individual, as opposed to factory-loaded ammunition.

1

was not manufactured by Hornady.  (Id. Ex. F 32:18–33:3, 74:23–75, 114:12–117:16, 164:15–17.)

Besides the fact that the ammunition was labeled as handloaded, two other facts demonstrate that the ammunition was not manufactured by Hornady.  First, the head stamp on the ammunition—a marking on the bottom of the cartridge identifying the manufacturer—read "Lyman .45-70 GOVT."  (Id. Ex. F at 34:4–19; id. Ex. L.)  Hornady head stamps, by contrast, read "Hornady." (Id. Ex. K; Declaration of Steve Hornady ("Hornady Decl.") ¶ 6.)  Second, the only .45-70 Government ammunition manufactured and sold by Hornady has a signature polymer red tip and is copper jacketed.  (Hornady Decl. ¶ 4.)  The handloaded ammunition did not have red tips or a copper jacket.  (Schneider Decl. Ex. F at 76:8–10, 98:24–99:3; id. Ex. L.)

Shope brought the Marlin rifle out on March 26, 2017, for Fischer and Gee to shoot.  (Id. Ex. F at 47:2–10.)  Shope provided them the handloaded ammunition.  (Id. Ex. E at 17:9–12; id. Ex. F at 50:24–51:2, 81:11–82:24.)  After Gee shot four to five rounds, he gave the gun to Fischer.  (Id. Ex. D at 40:1–11.) On the second round shot by Fischer, the gun exploded, causing injuries to his left hand.  (Id. Ex. B, ATI No. 3.)  Fischer was taken to the hospital.  (Id. Ex. D at 89:9–11.)  The gun was left at Shope's residence.  (Id. Ex. F at 84:10–16.)  Before leaving for the hospital, Gee picked up the spent cartridges and pieces of the cartridge that was in the gun when it exploded, and placed them on the concrete-slab floor of Shope's carport.  (Id. Ex. 15:3–17:4, 43:20–44:5, 62:8–63:5, 65:17–

66:13; id. at Ex. F at 84:13–15.)  He also put the box of ammunition away in Shope's garage.  (Id. Ex. F. at 45:5–16; 167:18–168:1.)

Two Jackson County sheriffs, Officers McCarty and Shepherd, came to the hospital and documented Fischer's injuries.  (Id. Ex. A at 14; id. Ex. D at 90:8–18; id. Ex. F at 82:22–24.)  The next day they went to Shope's residence and spoke to Shope.  (Id. Ex. A at 14; id. Ex. F at 85:1–6.)  Officer Shepherd's report states that "Mr. Fischer was firing a Marlin 4570 govt. caliber rifle ser# MR4B237D with a Hornady brand ammunition round."  (Id. Ex. A at 14.)  The obvious inference is that they were told by Shope that the gun had Hornady ammunition in it when it exploded.

Shope claims to have not seen the spent cartridges Gee saved in his carport after he returned from the hospital.  (Id. Ex. F at 86:6–88:2)  A day or two after the incident, Shope cleaned the exploded rifle.  (Id. Ex. F 88:3–92:8.)  He was aware that cleaning a rifle barrel can remove metal residue that had been left by fired ammunition.  (Id. Ex. F at 125:6–126:23.)

Two days after the incident, Shope called Remington, and stated to Remington that the ammunition he was using was 405 grain but that the manufacturer was unknown.  (Id. ¶ 14.)  This is significant because the handloaded ammunition used on the day of the incident was 405 grain, as opposed to the Hornady ammunition discussed below, which was 325 grain.  (Id. Ex. F at 71:23–24.)  This also shows that Shope knew at that time which ammunition was used in the incident and that it was not manufactured by Hornady.

3

At some point <u>after</u> the incident, Shope purchased a box of new Hornady LEVERevolution .45–70 Government 325 grain FTX ammunition, Lot No. 3163748.  (<u>Id.</u> Ex. F at 77:10–78:6; <u>id.</u> Ex. K.)  Hornady's .45–70 ammunition has a copper jacket and a signature red tip.  (<u>Id.</u> Ex. K; Hornady Decl. ¶ 4.)  It is the only .45-70 Government ammunition Hornady manufactures and sells. (Hornady Decl. ¶ 4.)  As mentioned above, the handloaded ammunition that was fired on the day of the incident did not have a red tip or a copper jacket. (Schneider Decl. Ex. F at 76:8–10, 98:24–99:3; <u>id.</u> Ex. L.)  Shope took the box of Hornady ammunition to the office of Fischer's attorney, Brian Miller, at least as early as February 2018.  (<u>Id.</u> Ex. F at 174:6–16.)

That box of Hornady ammunition, which contained 20 rounds of ammunition when purchased new, contained only 13 when presented to Fischer's attorney.  (<u>Id.</u> Ex. D at 43:16–18; Ex. F at 109:6–110:1.)  This is significant because Shope and Fischer represented that Shope had only ever fired a single round from the Marlin rifle before the day of the incident, and that Gee and Fischer fired approximately six rounds the day of the incident, for a total of seven shots fired.  (<u>Id.</u> Ex. B, ATI No. 1; <u>id.</u> Ex. D at 40:1–11; <u>id.</u> Ex. F at 38:4–6, 67:10–13; 180:15–21.)

The seven missing rounds from the box of Hornady ammunition were clearly removed to comport with this testimony and make it appear as though it were ammunition from that box that was fired on the day Fischer was injured. Shope, the only person to maintain possession of that box before bringing it to Miller's office, claims not to know how it is that seven rounds of the Hornady

ammunition came to be missing.  (Schneider Decl. Ex. F at 109:6–110:1, 170:19–172:13, 175:2–14.)

Shope represented that the single round he had fired before the day of the incident was Hornady ammunition from Lot No. 3163748 around the 2016 Ohio deer hunting season.  (Id. Ex. F at 22:20–22; id. Ex. B, ATI No. 1.)  But ammunition in that lot would not have been produced and shipped out from Hornady's manufacturing facility to Ohio or anywhere near until after the 2016 Ohio deer hunting season had ended.  (Id. ¶ 20; Hornady Decl. ¶ 5.)

At an August 15, 2018 inspection of the Marlin rifle and the ammunition involved in the incident, Shope represented to attorneys and experts for Remington/Marlin and Hornady, as well as to an expert for Fischer (Steven Howard), that the Hornady LEVERevolution .45–70 Government 325 grain FTX ammunition Lot No. 3163748, the fired cartridges missing, and the 13 unfired rounds therein were the only .45-70 Government ammunition present and which was being fired at the March 26, 2017 incident.  (Id. ¶ 21; Ex. D at 7:7–11; id. Ex. F at 104:4–105:17.)

As a result of Shope's deliberate misrepresentations, Fischer, through his attorney, sent a demand to Hornady on January 25, 2019, representing that Fischer was shooting the Hornady ammunition when the Marlin rifle exploded. (Id. Ex. A.)  Later, on March 13, 2019, Fischer brought a complaint against Hornady for products liability, specifically alleging, "When the rifle exploded it was loaded with Hornady LEVERevolution .45-70 Government 325 grain FTX

ammunition manufactured, distributed, and/or sold by Hornady and/or ABCs."
(Complaint, Doc. No. 3 ¶ 15.)

On or about August 23, 2019, Shope presented the rifle and the box of
Hornady ammunition to Fischer's expert, Robert Carbonara for S-E-A.
Carbonara created a handwritten receipt, signed by both him and Shope, stating
that Shope provided Carbonara with ten unused Hornady .45-70 Government
325 grain FTX cartridges, and 3 disassembled in separate plastic bags.
(Schneider Decl. Ex. H.)  Carbonara's report reflects this fact as well.  (Id. Ex. C
at 8.)  Carbonara's report also states that "Mr. Shope had purchased . . . a box
of 20 cartridges of Hornady 45-70 ammunition in the fall of 2016," indicating
that Shope had lied to Carbonara about when he purchased that ammunition.
(Id. Ex. C at 10; see also id. Ex. F at 180:23–182:9.)   In fact, the Hornady
ammunition in Lot No. 3163748 was not manufactured until December of 2016
and was not shipped from Hornady's manufacturing facilities to any location in
or near Ohio until after December 19, 2016.  (Hornady Decl. ¶ 5.)

Fischer provided answers to Hornady's interrogatories on January 13,
2020.  (Schneider Decl. ¶ 6.)  Fischer consulted Shope to provide those answers.
(Id. Ex. D at 67:12–16.)   Those answers repeatedly asserted that the only
ammunition ever fired in the Marlin rifle, including both the ammunition
allegedly fired around the 2016 Ohio deer season and the ammunition fired on
the day of the incident, was Hornady LEVERevolution .45-70 Government 325
grain FTX ammunition.  (Id. Ex. B, ATI Nos. 1, 3, and 6.)

6

Testing performed by Hornady's own expert, Joe Thielen, revealed that the Marlin rifle had not, in fact, ever fired Hornady's .45-70 Government 325 grain FTX ammunition.  (<u>Id.</u> ¶ 8.)  That ammunition is copper jacketed.  (Hornady Decl. ¶ 4.)  The barrel of a rifle contains spiraled lands and grooves (rifling) that "grab" a bullet being fired and cause it to spin.  (Schneider Decl. Ex. F at 125:6–126:23.)  Because the bullet is in contact with the lands, it leaves behind residue of whatever material it is made of.  (<u>Id.</u>)  Thielen's analysis of the barrel revealed no copper residue on the lands of the Marlin rifle, only lead.  (<u>Id.</u> ¶ 8.)  Thielen also concluded that the brass smear on the bolt face was not consistent with the font on the Hornady ammunition's headstamp.  (<u>Id.</u> ¶ 8.)

On January 29, 2020, counsel for Hornady and Remington explained to Miller that they had irrefutable evidence that the Marlin rifle had never fired the Hornady .45-70 government ammunition.  (<u>Id.</u> ¶ 9.)  They urged Miller to confirm this fact with Shope, plaintiff, and his own experts.  (<u>Id.</u>)  Miller subsequently reported that he had discussed these things specifically with Mr. Fischer and Mr. Shope, and that they had insisted that it was Hornady ammunition in the gun at the time of the incident.  (<u>Id.</u>)

Subsequently, on February 25 and 26, 2020, counsel for Hornady and Remington took the depositions of all six witnesses to the incident, including Gee, plaintiff, and Shope.  (<u>Id.</u> ¶¶ 10–12.)  During those depositions, the box of Hornady ammunition purchased by Shope after the incident, which was brown, was marked as Exhibit 7.  (<u>Id.</u> Ex. E at 53:16–18; <u>id.</u> Ex. F at 40:7–9; <u>id.</u> Ex. K.)  Gee, in his deposition, testified:

> A.    I remember it was brand new ammunition, still in the box.  The box contained a plastic sleeve that all the ammunition fits inside when you pull it out, and it was Hornady brand ammunition with the red tips.

(Schneider Dep. Ex. E at 7:3–7.)

> Q.    So from your memory could you tell us whether the ammunition that was there the day of the incident was solid lead bullets versus hollow point?
>
> A.    Standard Hornady lead rounds with the red tip on top that they put on almost all their ammunitions.
>
> Q.    You do vividly remember specifically the red tip?
>
> A.    Yes, because Hornady's the only brand that does that.

(Id. Ex. E at 8:12–22.)

> Q.    And, again, you're under oath today so I want to be really clear.
>
> A.    Yes.
>
> Q.    Do you remember the red tips in 2017, or is that something that was told to you and refreshed to you within the last two weeks?
>
> A.    No, that's something I remember.  That's not really an incident you're going to forget in just a few years after seeing what happened.

(Id. Ex. E at 9:7–15.)

> Q.    So when you shot the .45-70 GOVT, you believe that the bullets were leaded, correct?
>
> A.    Yes.
>
> Q.    But you think they had a red polymer tip?
>
> A.    Yes.
>
> Q.    And you believe they came out of a Hornady box?

A.     Yes, they came out of the new Hornady box.

Q.     Okay.  How do you know the box was brand new?

A.     Because everything in it was still sealed up right.

Q.     What do you mean by that?

A.     When you open the box and pulled the rounds out, they was still fully loaded with Hornady rounds.  There were no different rounds, not other companies.

Q.     So just -- did you check all of the head stamps?

A.     Yes.  George --

Q.     You checked all of the head stamps before you shot?

A.     Head stamps?

Q.     Do you know what a head stamp is?

A.     I believe so, but the tops of the ammunitions or the backs of them where the prints are.

Q.     Right.

A.     Yeah, before we -- when you load them in, you have to flip them to look at them, and I usually read every bullet anyway just as a bad habit from the military to make sure everything's right.

Q.     So you recall checking the head stamps?

A.     Yes, to make sure every round is a .45-70 round.  You don't want any other kind of round to slip in by mistake, because I had a pocketful of ammunition of my own.

(Id. Ex. E at 25:3–18.)

Q.     All right.  Now, you had indicated that you looked at the head stamp on each of the rounds?

A.     Yeah, as I load them since the head stamp would be facing me to load, I just read as I'd doing things.

9

> Q.    All right.    Checking to make sure it was the right caliber?
>
> A.    Basically, yes, just as a safety precaution.  I do it with any gun I'm operating.
>
> Q.    Now, goes back almost three years so I'm going to ask you this question.   Listen to it carefully.   Do you specifically remember what you read that was on the end of the case head?
>
> A.    Not the entirety, but I remember specifically reading .45-70 Government and Hornady on the bottom side underneath the top ring of the casings.
>
> Q.    You have a specific recollection of reading Hornady .45-70 Government on the case head?
>
> A.    Yes, sir.
>
> Q.    For each and every of those five rounds you put into the rifle you read the case head on each and every one of those rounds?
>
> A.    Yes, sir.
>
> Q.    Yes?
>
> A.    Yes.

(Id. Ex. E at 60:16–61:19.)  Gee also testified that the box of ammunition Shope brought out was brown, (id. Ex. E at 53:17); that the ammunition he described was the only ammunition fired that day, (id. Ex. E at 76:12–15); and after being shown Exhibit 7, testified that it was the same ammunition and box used on the day of the incident, (id. Ex. E at 81:3–84:23; 86:15–24; 88:2–12). Gee's errata sheet was returned with no changes made to his testimony. (Id. Ex. E at p. 114.)

The day after Gee's deposition, Shope appeared at his deposition with the white box of handloaded ammunition, which was marked as Exhibit 25.  (Id. Ex. F at 26:23–27:2, 32:4–14; id. Ex. L.)  Initially, Shope stated that he had never

shot any ammunition from that box.  (Id. Ex. F at 26:23–27:16, 34:20–35:3.)  He further maintained that he had just discovered Exhibit 25 that morning, and that he had not realized that the crate of gun-related accoutrements he had purchased in September 2016 had .45-70 Government ammunition in it until that day.  (Id. Ex. F at 31:13–22, 33:14–22.)  Under further questioning, however, Shope's testimony changed:

> Q.    So when the gun blew up and Dakota was shooting the gun --
>
> A.    Yes.
>
> Q.    -- was the ammunition from Exhibit 25, not from Exhibit 7?
>
> A.    I would say yes.
>
> Q.    Are you willing to admit today that the ammunition in Exhibit 7, the Hornady ammunition, was not fired in the gun when it blew up on Dakota?
>
> A.    At the time I thought it might have been, but no, it wasn't.
>
> Q.    Today you agree that it was not Hornady ammunition that was in the gun when it blew up?
>
> A.    Yes.
>
> Q.    It was Exhibit 25 ammunition that was in the gun when it blew up?
>
> A.    Yes.
>
> Q.    And Exhibit 25 is hand-loaded ammunition with a Lyman head stamp that was what was being shot when the gun blew up?
>
> A.    I would say yes.
>
> Q.    Okay.  Absolutely, it was not the Hornady ammunition?

> A.    I don't think it was, no.

(Id. Ex. F at 38:14–39:14.)

> Q.    The brown box, Exhibit 7, wasn't even there, was it?
>
> A.    No.
>
> Q.    It was not there?
>
> A.    I don't think so, because I think it was the white box.
>
> Q.    Yeah.  The white box, Exhibit 25, was what you were shooting out of the day of the incident, correct?
>
> A.    I would say yes.
>
> Q.    The brown box, Exhibit 7, wasn't even there that day, was it?
>
> A.    No, I don't think it was.

(Id. Ex. F at 40:7–19.)  At this point in the deposition, the parties took a break and Fischer dismissed Hornady from the suit.  (Id. ¶ 13; Partial Stipulation of Dismissal, Doc. No. 32.)  With counsel for Remington continuing, the deposition continued.  Shope asserted that after the accident, Gee had "picked up" Exhibit 25 and "put it away," and that Shope subsequently looked for it a few times without success and had "just stumbled upon it th[at] morning" under a pile of old rags. (Schneider Decl. Ex. F. at 45:5–16; 167:18–168:1.)  Shope also testified:

> Q.    At the time you brought it outside as of the day of the incident had you, in fact, purchased the Hornady rounds that we marked as Exhibit 7?
>
> A.    No.
>
> Q.    So the box of Hornady ammunition marked as Exhibit 7 you purchased after the incident occurred.  Is that correct?

12

A.    I don't -- I wouldn't say that I did, no.  I would say no.

Q.    Let me go back because I'm a little confused.  Did you purchase the Hornady factory ammunition in the box we marked as Exhibit 7, did you purchase that box before or after the incident involving your grandson?

A.    I would say after.

(Id. Ex. F at 77:10–78:1.)

Referring to Exhibit 25, the white box of handloaded ammunition:

Q.    You knew, however, at the time that the boys were shooting that they were shooting -- on the day of the incident that they were shooting ammo out of that box, correct?

A.    Yes.

Q.    And we've established, I believe, that those rounds did not have a red tip, did it -- did they?

A.    No.  No.

(Id. Ex. F at 98:19–99:3.)

Q.    That box, which was marked as Exhibit 7, was presented to attorneys and representatives for Hornady and Remington in August of 2018 at Mr. Miller's office.  How did it come to be that you brought that box of ammunition to Mr. Miller's office on that date?

A.    Because I couldn't find the other one that said Hornady.

Q.    All right.  Now, you understood at the time in August of 2018 that none of the rounds that had been fired from the rifle had been fired out of the box marked as Exhibit 7, true?

A.    Yes.

. . . .

Q.    So you went to Mr. Miller's office in August of 2019 [sic, 2018], you took this box of ammunition that's the factory box of Hornady, Exhibit 7, to Mr. Miller's office to show to the other parties. Is that correct?

A.    Yes.

Q.    Now, you knew at the time, did you not, that the rounds that were fired that day did not come out of that box?

A.    Yes.

Q.    Did you tell anybody that day that the rounds of ammunition fired out of the rifle the day of the incident did not come out of that box?

A.    No.

(Id. Ex. F at 105:5–106:17.)

Q.    When the box of ammunition marked as Exhibit 7 was brought to Mr. Miller's office in August of 2018 there were seven rounds missing from that box.  Why were they not in the box on that day.

A.    I'm not real sure.

Q.    Did you at some point tell Dakota that the rounds fired during the incident -- during the day of the incident were from this box, Exhibit 7?

A.    I don't think so.

Q.    Do you have any explanation whatsoever that Dakota said that they were firing rounds on the day of the incident with a red tip?

A.    No.

Q.    In fact, that's not true, is it?

A.    No.

Q.    And any representation, sir, that the rounds fired on the day of the incident came from this box that's marked as Exhibit 7, the Hornady factory box, any representation or statements that those were the rounds fired on the day of the incident, that is also not true?

14

A.      Yep, I don't -- I don't even know if Dakota looked at them, and Gee.

THE COURT REPORTER:      Looked at what?

THE WITNESS:      The shells they were putting in the gun.

(Id. Ex. F at 107:9–108:12.)

Q.      Why did you bring the box of Hornady ammunition marked as Exhibit 7 with the red tips that you bought after the incident?  Why did you bring that -- why did you bring that to Mr. Miller's office in 2018 [sic] and so that the representatives of Hornady and Remington could look at it?

A.      Because I couldn't find the old Hornady.

Q.      In fact, sir, what you couldn't find was the box with the reloading sticker that had Hornady on it?

A.      Yes.

Q.      But yet the rounds -- the rounds in the box were Lyman cartridge cases, and those were rounds that you thought could very well have been reloaded, correct?

A.      Yes, I thought they could be, yes.

(Id. Ex. F at 113:2–18.)

Q.      Well, you've told us all along today that the cartridge in Exhibit Number 7, the Hornady rounds of ammunition, were not the rounds involved in the incident, true?

A.      Yes.

Q.      And so at any time when you were with Mr. Carbonara did you tell him that the box of ammunition that was provided to him, 13 cartridges, three of which had been broken down, the bullet and powder removed, did you tell him that that was not the box involved in the incident?

A.      No.

Q.      Why not?

15

A.      I don't know.  I could -- I didn't know where the other were so that's all --

Q.      Was it your idea to represent to Mr. Carbonara and Mr. Miller that the box of ammunition in Exhibit 7 was the box of ammunition actually involved in the incident when you knew it not to be true?

A.      Yes.  Nobody knew about it.  No one else knew about it.

Q.      So were you representing to Dakota himself that the box of ammunition that is marked as Exhibit 7 that you tell us today was purchased after the incident was the box of ammunition involved in this incident?

A.      Did I tell him that, is that what you asked?

Q.      Yes.

A.      I never came out --

Q.      Yes.

A.      I never came right out and told him, but yes, that's what I was insinuating.

(Id. Ex. F at 180:23–182:9.)

Q.      Mr. Shope, just a couple more.  Did you believe after the incident at any time that the ammunition may have caused the incident or at least partially caused the incident.

A.      No, I didn't.  I didn't because like I said, I've never had a problem with ammunition.

Q.      If you didn't believe that, then why did you go out and buy the factory-loaded Hornady ammunition marked as Exhibit 7 after the incident and then represent to your own grandson, to his attorneys, to his expert, and perhaps to others that this was the ammunition used in the rifle?

A.      I couldn't find the old ammunition and I knew it had Hornady on it.

        . . . .

16

> Q.    And you knew when you purchased the -- this Hornady box, Exhibit 7, that this was ammunition that was different from the box of ammunition that you had at the time of the incident and later couldn't find, right?
>
> A.    Yes.

(Id. Ex. F at 183:23–185:5.) Shope admitted that the Marlin rifle, in fact, had never shot any Hornady LEVERevolution .45-70 Government 325 grain FTX ammunition.   (Id. Ex. F at 123:8–14.)   Shope further stated that if Dakota received information that Hornady's ammunition was involved in the incident that he put into his interrogatory answers, "I had to tell him."   (Id. Ex. F at 123:22.)

## IV.    ARGUMENT

HORNADY has expended over $110,000 in attorney's fees, costs, and expenses to defend itself from an outright fraud, perpetrated upon it and this Court. (Schneider Decl. ¶ 22.) Shope knew that the box of ammunition he used was handloaded ammunition, and he made a deliberate, concerted effort to represent to Jackson County sheriffs, counsel for the parties in this case, and the parties' experts that it was Hornady manufactured ammunition—not handloaded ammunition—that was in the gun when it exploded.  His scheme involved:  destroying the spent cartridges preserved by Gee; cleaning the gun after the incident; purchasing a box of new Hornady ammunition after the incident; removing seven cartridges from the box to be consistent with his story; and knowingly making the false representation to all parties, their counsel, and

their experts that specific Hornady ammunition from Lot No. 3163748 was involved in the incident.

Once it became apparent to Shope during his deposition that the story of the number of rounds fired, the timing, and the scientific evidence would show his assertion to be false, he produced Exhibit 25. He stated that he had been unable to find it before then, and that he just happened across it that morning under a pile of old rags. This self-serving assertion that he coincidentally discovered the box of handloaded ammunition that morning after having misplaced it since the day of the incident, even if true, does not negate the litany of fraudulent acts he admitted to committing.

Gee also made fraudulent statements of fact. Exhibit 25 was at least 24 years old on the day of the incident, and contained ammunition with Lyman head stamps without red polymer tips. Gee testified, however, that the ammunition came from a new Hornady box; that he checked the head stamps on each round and confirmed they were Hornady ammunition; and that he clearly recalled the ammunition having red polymer tips. After the incident, Gee is the one who put the old white box Exhibit 25 away. He knew the brown box Exhibit 7 of brand new Hornady ammunition with red polymer tips was not involved in the incident, but he lied to attempt to support his friend's claims.

As explained below, this court is possessed of authority to sanction non-party witnesses under these circumstances; Shope's and Gee's actions are patently sanctionable; and the appropriate sanction should be Hornady's fees, costs, and expenses resulting from Shope's and Gee's misconduct.

### A. Shope and Gee are Subject to the Court's Inherent Authority to Sanction Misconduct.

"[A] court may assess attorney's fees when a party has 'acted in bad faith, vexatiously, wantonly, or for oppressive reasons.'  In this regard, if a court finds 'that fraud has been practiced upon it, or that the very temple of justice has been defiled,' it may assess attorney's fees against the responsible party."  Chambers v. NASCO, Inc., 501 U.S. 32, 45–46 (1991) (quoting Alyeska Pipeline Serv. Co. v. Wilderness Soc'y, 421 U.S. 240, 258–59 (1975)).  As this Court has said:

> Lying cannot be condoned in any formal proceeding.  Our legal system is dependent on the willingness of the litigants to allow an honest and true airing of the real facts.  As our colleague, Judge Gettleman has stressed: "parties who wish to use the judicial system to settle disputes have certain obligations and responsibilities.  One of those responsibilities is, to tell the truth in a deposition. This Court, too, has a responsibility: where we find deliberate falsehoods told in proceedings, we cannot allow such conduct to go unchecked.  Turning a blind eye to false testimony erodes the public's confidence in the outcome of judicial decisions, calls into question the legitimacy of courts and threatens the entire judicial system."

Further, the Seventh Circuit has held that a plaintiff "abuse[s] the judicial process by seeking relief based on information that the plaintiff knows is false."  As the Seventh Circuit explained:

> [F]alsifying evidence to secure a court victory undermines the most basic foundations of our judicial system. If successful, the effort produces an unjust result. Even if it is not successful, the effort imposes unjust burdens on the opposing party, the judiciary, and honest litigants who count on the courts to decide their cases promptly and fairly.

Ndoye v. Major Performance LLC, No. 1:15-cv-380, 2017 WL 822110, at *11 (S.D. Ohio Mar. 1, 2017) (citations omitted) (first passage quoting Quela v. Payco-Gen.

19

Am. Creditas, Inc., No. 99-cv-1904, 2000 WL 656681, at *7 (N.D. Ill. May 18, 2000); second and third passages quoting Secrease v. W. & S. Life Ins. Co., 800 F.3d 397, 401–02 (7th Cir. 2015)).

In Chambers, the Supreme Court held that federal courts in diversity cases may impose attorney's fees as a sanction pursuant to their inherent authority. 501 U.S. at 51–55. Importantly, Chambers upheld sanctions levelled against the petitioner for his conduct before he was a party to the case. Id. at 55–56. It also noted, without disapproval, that the district court in that case "sanctioned other individuals, who are not parties to the action in this Court," including Chambers's sister, trustee of a trust created by Chambers in aid of his sanctionable conduct. Id. at 40 n.5.

As Chambers indicates, the Court's inherent authority to sanction applies not only to parties and their counsel, but to nonparty witnesses as well. "A federal court has the inherent power to impose sanctions against a . . . non-party who has acted in bad faith, vexatiously, wantonly, or for oppressive reasons. [One's] status as a non-party does not insulate him from sanctions for abuse of the litigation process." Am. Tr. v. Sabino, 230 F.3d 1357, at *1 (6th Cir. 2000) (citations omitted); see also Manez v. Bridgestone Firestone N. Am. Tire, LLC, 533 F.3d 578, 585 (7th Cir. 2008) ("No matter who allegedly commits a fraud on the court—a party, an attorney, or a nonparty witness—the court has the inherent power to conduct proceedings to investigate that allegation and, if it is proven, to punish that conduct."); Corder v. Howard Johnson & Co., 53 F.3d 225, 232 (9th Cir. 1994) ("[A] court may impose attorney's fees to sanction a non-

20

party whose actions or omissions cause the parties to incur additional expenses."); Adesanya v. Novartis Pharm. Corp., No. 213-cv-5564, 2016 WL 4401522, at *8 (D.N.J. Aug. 15, 2016) ("Non-parties may not . . . give misleading testimony with impunity."), aff'd sub nom. Adesanya v. Novartis Pharm. Corp, 755 F. App'x 154 (3d Cir. 2018); Clapper v. Clark Dev., Inc., No. 5:09-cv-569, 2014 WL 1493150, at *2 (N.D. Ohio Apr. 15, 2014) ("Moreover, a federal court has the inherent power to impose sanctions against a party or non-party who has acted in bad faith, vexatiously, wantonly, or for oppressive reasons."), aff'd, No. 14-3500, 2015 WL 13688415 (6th Cir. Apr. 29, 2015); In re White, No. 2:07-cv-342, 2013 WL 5295652, at **28–35 (E.D. Va. Sept. 13, 2013) (concluding inherent authority existed to sanction nonparty and nonwitness that made threatening statements toward litigants and counsel); Cozzens v. City of Lincoln Park, No. 08-11778, 2012 WL 10910612, at *13 (E.D. Mich. Feb. 6, 2012) ("The court's inherent power to sanction for abusive litigation practices includes nonparties."), report and recommendation adopted in relevant part, No. 08-11778, 2014 WL 2587667 (E.D. Mich. June 10, 2014); Helmac Prods. Corp. v. Roth (Plastics) Corp., 150 F.R.D. 563 (E.D. Mich. 1993) (imposing sanctions on nonparty not subject to court order for destruction of documents where nonparty had substantial interest in the outcome of the litigation and substantially participated in the proceedings in which he interfered).

Most on point with this case is Bartos v. Pennsylvania, No. 1:08-cv-366, 2010 WL 1816674 (M.D. Penn. 2010). In Bartos, the plaintiff brought a claim against the State of Pennsylvania for employment discrimination. During the

21

pendency of the litigation he secured a position with a new employer. An anonymous letter was then sent to the new employer describing disciplinary actions taken against the plaintiff while employed by the State of Pennsylvania and attaching supporting state-record documentation.

Two nonparty witnesses appeared for depositions and gave testimony that they were unaware of the anonymous letter and played no role in its creation or transmission. Later information, however, "rais[ed] the clear inference that they had participated in the submission of the anonymous letter, something they had repeatedly denied under oath in June, 2009." Id. at *2. As a result of that clear inference, the witnesses submitted errata sheets correcting their testimony.

The court recognized that "the power of this Court to sanction misconduct by witnesses and non-party deponents in civil cases is beyond any serious dispute." Id. at *4. "Moreover, sanctionable misconduct by these non-party witnesses can take many forms, including: failures to appear; destruction of evidence; or giving false, misleading and materially incomplete testimony." Id. at *5 (citations omitted). The court concluded that the witnesses' having been identified by the parties as material witnesses and the very actions the witnesses felt it necessary to undertake showed their "direct, substantial, and personal interests" in the litigation. Id. at *7. It also concluded that the witnesses' decision to send the letter and then to lie about it during their depositions demonstrated their substantial participation in the proceedings in which they interfered. Id.

The court then emphasized the gravity of the witnesses' misconduct and noted that although the witnesses corrected their testimony via errata sheets, "they did so only after they learned that [the plaintiff] knew, or would soon learn of their misconduct." Id. at *8.  The court imposed as sanctions the witnesses' payment of the plaintiff's costs and fees incurred as a result of taking the witnesses' follow-up depositions and in making their motion for sanctions. Id. at *9.

Here, Shope and Gee are analogous to the witnesses in Bartos.  Fischer provided the names of Shope and Gee as material witnesses in his interrogatory answers. (Schneider Decl. Ex. B, ATI No. 2.)  Shope's testimony establishes that he felt he had a personal interest in his grandson's litigation, as he went to great lengths to influence its outcome and to conceal that he had provided Fischer handloaded ammunition as opposed to new factory loaded ammunition on the day of the incident.  Gee similarly took actions—falsely claiming to have personally inspected the head stamp on every round he loaded in the Marlin rifle, having seen a brand new Hornady box, and claiming to vividly remember the red-tips of the ammunition—all of which show he was interested in the outcome of his friend Fischer's litigation.  Shope's and Gee's interests, while perhaps not directly pecuniary, were nevertheless direct, substantial, and personal, as evidenced by the fact that both committed deliberate falsehoods in support of plaintiff's claims.

Furthermore, each substantially participated in the proceedings in which they interfered.  Shope, clearly, was closely tied to the litigation from its outset.

23

The incident occurred on his property with his gun and his ammunition. Every bit of physical evidence related to liability that was produced in this case was provided by him and kept in his custody until turned over to counsel and the experts by Shope.

Moreover, relevant physical evidence that was not produced—the spent cartridges fired the day of the incident including pieces of the exploded cartridge—were gathered and left on his property by Gee and likely spoliated by Shope himself. Shope cleaned the gun afterward, knowing it could remove relevant physical traces from the ammunition the gun had fired and thereby attempting to hide evidence. The false representation that Hornady ammunition was fired the day of the incident—the singular basis for Hornady's involvement in this litigation at all—was made by Shope and he also made affirmative acts by purchasing Hornady ammunition after the incident and removing seven cartridges from the box. It was Shope that brought the Hornady ammunition to Miller's office and who also presented it to Carbonara.

Also, as in Bartos, the gravity of the misconduct involved here weighs heavily toward sanctions. Shope made knowing and false representations to counsel, experts, parties, and police officers, spoliated evidence, and fabricated evidence in a calculated and years-long scheme to secure for his grandson an award against Remington and Hornady. And also to conceal Shope's own complicity in having his grandson shoot handloaded ammunition he purchased from an unknown source. Gee participated in this scheme. His testimony of vividly recalling the red tips on the day of the incident, the certainty with which

24

he testified that he checked every head stamp, and his claiming after personally handling the 24-year-old white box that the ammunition involvement came from a brand new brown box, cannot be accounted for by mere faulty memory. This was a concerted effort on his part to corroborate Fischer's and Shope's false narrative.

In addition, Shope's actions contributed to Fischer's giving false answers to Hornady's interrogatories. As a nonparty, Shope does not appear to come within the ambit of Federal Rule of Civil Procedure 26(g). Nonetheless, his active and knowing participation in providing false information to Fischer, who in turn placed that information into his interrogatory answers, constitutes a flagrant abuse of the litigation process.

It is true that Shope "came clean" part way through his deposition, but this was only because a month earlier counsel for Hornady made clear to attorney Miller that irrefutable scientific evidence existed that would expose Shope's misconduct. Miller communicated this to Shope. Not only this, but Shope did not initially proffer the truth at his deposition. Instead, he asserted that he had purchased Exhibit 7 before the accident and that the ammunition in Exhibit 25 had never been shot in the rifle or even known to him until that morning. Under further questioning, his story morphed into admissions of the truth, which included a self-serving tale that he could not find the handloaded ammunition of Exhibit 25. This is not a mea culpa, but rather an evasive attempt to escape scrutiny for his discretely dishonest acts. Furthermore, Gee— who made no changes in his errata sheet—did not even avail himself of this

25

means of correcting his testimony that the <u>Bartos</u> court found insincere and insufficient anyhow.

**B.** **Shope and Gee are Also Subject to the Court's Authority to Impose Contempt Sanctions for Failure to Follow Court Order.**

Both Shope and Gee are also subject to the Court's contempt power because they violated a court order: the subpoenas commanding them to appear and give truthful testimony.  <u>See</u> Fed. R. Civ. P. 45(g).  Shope and Gee appeared at their depositions in response to Rule 45 subpoenas served on them by Hornady.  (Schneider Decl. ¶¶ 11, 12, 17.)

Civil contempt sanctions are available against nonparties for failure to comply with a court order.  <u>E.g.</u>, <u>Marshal v. Bramer</u>, 828 F.2d 355 (6th Cir. 1987) (affirming contempt order entered against nonparty for refusal to comply with order to produce information in response to subpoena duces tecum).  A subpoena is an order of the court for a person to appear as a witness in a case. <u>See</u> <u>In re Minniti</u>, No. 99-11652DWS, 2000 WL 275852, at *3 (Bankr. E.D. Pa. Jan. 4, 2000) ("A subpoena is an order of court which must be obeyed unless compliance is excused."); <u>Holbrook v. Cafiero</u>, 18 F.R.D. 218, 219 (D. Md. 1955) ("[A] subpoena is an order to a person to appear as a witness in the case.").  Indeed, because a subpoena is an order of the court, "contempt sanctions are available merely for the initial disobedience of the subpoena, and a prior court order compelling compliance with the subpoena is not invariably required." <u>Baranski v. United States</u>, No. 4:11-cv-123, 2014 WL 7335151, at *8 (E.D. Mo.

26

Dec. 19, 2014) (quoting 9 <u>Moore's Federal Practice</u> § 45.62[3]).  As the Seventh

Circuit has stated:

> Rule 45(e)[2] speaks directly to the power of the district court to hold the recipient of a subpoena in contempt: "The issuing court may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena." Fed.R.Civ.P. 45(e). The contempt provision in subsection (e) does not distinguish between subpoenas issued with some court involvement—those issued in blank by the court clerk and completed by the party who requests it—and those issued without any court involvement at all by an attorney as an officer of the court. Instead, subsection (e) of Rule 45 broadly refers to the contempt power of the "issuing court," which implies that all discovery subpoenas are contempt-sanctionable orders of the court whether issued in blank by the clerk or by an attorney as an officer of the court.

<u>U.S. S.E.C. v. Hyatt</u>, 621 F.3d 687, 693 (7th Cir. 2010).

Inherent in the command of a subpoena to appear and give testimony is

an expectation that the testimony given will be truthful.  "Anyone who testifies

in court bears an obligation, to the court and society at large, to tell the truth."

<u>Lane v. Franks</u>, 573 U.S. 228, 238 (2014).  A Rule 45 subpoena is, at bottom, an

order to appear and provide sworn testimony under an oath to tell the truth.  To

appear at a deposition and purposefully lie under oath, therefore, is a violation

of a subpoena and thereby a violation of a court order.  Shope and Gee should

be found in contempt and sanctioned accordingly.

### C.    Hornady is Entitled to Recover its Attorney's Fees.

The concerted efforts of Shope and Gee were calculated to mislead all

involved with the false assertion that Hornady was a proper party to this lawsuit.

Every dollar Hornady has spent in defending itself in this action is a direct result

---

[2] Now codified, in substantially similar form, at Federal Rule of Civil Procedure 45(g).

of Shope's and Gee's mendacity. Accordingly, Hornady should be awarded its entire amount of attorney's fees, costs, and expenses associated with this case, which to date exceed $110,000. (Schneider Decl. ¶ 22.) Hornady stands ready to submit documentation to prove the precise amounts upon an order from the Court, and Hornady acknowledges the propriety of a pro tanto reduction of such award by the amount of its settlement with Fischer, submitted separately to the Court. Hornady has communicated with Shope and Gee about the matter, but has not been able to reach an agreement with either Shope or Gee.

## V. CONCLUSION

For the reasons set forth above, Hornady respectfully requests that the Court impose sanctions upon Shope and Gee totaling its fees, costs, and expenses incurred to defend this action, including the instant motion. Specifically an order:

1. Finding that Shope and Gee are liable, jointly and severally, for Hornady's attorney's fees, costs, and expenses incurred in defending this action, including the cost of making this motion;

2. Requesting Hornady to submit evidence in support of that amount;

3. Finding that amount subject to a pro tanto reduction by amounts actually paid by Plaintiff Dakota Fischer under the Settlement Agreement and Consent Judgment filed with the Court.

[*Signature on next page.*]

28

HORNADY MANUFACTURING CO.,
Defendant

By:    /s/ Kevin J. Schneider
       Kevin J. Schneider, # 18898
       CLINE WILLIAMS WRIGHT
         JOHNSON & OLDFATHER, L.L.P.
       1900 U.S. Bank Building
       233 South 13th Street
       Lincoln, Nebraska 68608-2095
       (402) 474-6900
       kschneider@clinewilliams.com

       *Admitted Pro Hac Vice*

       James E. Arnold (0037712)
       Damion M. Clifford (077777)
       Arnold & Clifford LLP
       115 W. Main Street, 4th Floor
       Columbus, NE 43215
       dclifford@arnlaw.com

       *Counsel for Defendant Hornady*

## **CERTIFICATE OF SERVICE**

I hereby certify that on May 7, 2020, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which by its operation will send notification of such filing to all registered parties.

| | |
|---|---|
| Brian G. Miller | Robert V. Kish |
| Adam L. Slone | Remington Co., LPA |
| Brian G. Miller Co., LPA | 200 Civic Center Drive, Suite 800 |
| 250 West Old Wilson Bridge Road, Suite 270 | Columbus, Ohio 43215 |
| Worthington, Ohio 43085 | rkish@reminger.com |
| bgm@bgmillerlaw.com | *Attorney for Defendants Remington Arms Company, LLC and Remington Outdoor Co., Inc.* |
| als@bgmillerlaw.com | |
| *Attorneys for Plaintiff* | |

Steven E. Danekas
Swanson Martin & Bell, LLP
Suite 3300
330 North Wabash
Chicago, IL 60611
sdanekas@smbtrials.com
*Attorney for Defendants Remington Arms Company, LLC and Remington Outdoor Co., Inc.*

I further certify that on May 7, 2020, I caused the foregoing to be served by personal service upon the below non-parties, proof of which service will be filed with the Court upon receipt:

| | |
|---|---|
| George Shope | Joshua Gee |
| 11870 State Route 139 | 7141 Mount Tabor Road |
| Jackson, OH 45640 | Chillicothe, OH 45601 |

By:     /s/ Kevin J. Schneider
            Kevin J. Schneider

4831-0704-2745, v. 3